# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WESTERN MISSOURI
## KANSAS CITY MISSOURI

DONNA HUFFMAN, Individually
and on Behalf of All Others Similarly
Situated,

                Plaintiffs,

vs.

AUTOMATIC DATA PROCESSING, INC., ADP, INC., ADP
BROKER-DEALER, INC., ADP INVESTOR
COMMUNICATION SERVICES, INC., ARTHUR F.
WEINBACH, JAMES P. BLAKE, RUSSELL P. FRADIN,
DELOITTE & TOUCHE LLP, FIDELITY DISTRIBUTORS,
INC., FIDELITY MANAGEMENT & RESEARCH COMPANY,
FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS
COMPANY, INC., FIDELITY MANAGEMENT TRUST
COMPANY, EDWARD C. JOHNSON 3rd,FIDELITY
ADVISOR ASSET ALLOCATION, FIDELITY ADVISOR
BALANCED, FIDELITY ADVISOR BIOTECHNOLOGY,
FIDELITY ADVISOR CONSUMER INDST, FIDELITY
ADVISOR CYCLICAL INDST, FIDELITY ADVISOR
DEVELOPING COMM, FIDELITY ADVISOR DIVERSIFIED
INTL, FIDELITY ADVISOR DIVIDEND GROWTH, FIDELITY
ADVISOR DYNAMIC CAP APP, FIDELITY ADVISOR
ELECTRONICS , FIDELITY ADVISOR EMERG MKTS INC,
FIDELITY ADVISOR EMERGING ASIA, FIDELITY
ADVISOR EQUITY GROWTH , FIDELITY ADVISOR
EQUITY INCOME, FIDELITY ADVISOR EQUITY VALUE,
FIDELITY ADVISOR EUROPE CAP APPREC, FIDELITY
ADVISOR FIFTY, FIDELITY ADVISOR FINANCIAL SVC,
FIDELITY ADVISOR FLOAT RATE HI INC, FIDELITY
ADVISOR GLOBAL EQUITY, FIDELITY ADVISOR GOVT
INVESTMENT,FIDELITY ADVISOR GROWTH & INCOME,
FIDELITY ADVISOR GROWTH OPPORT, FIDELITY
ADVISOR HEALTH CARE, FIDELITY ADVISOR HIGH INC
ADVANT,FIDELITY ADVISOR HIGH INCOME, FIDELITY
ADVISOR INTERM BOND, FIDELITY ADVISOR INTL
CAPITAL APP, FIDELITY ADVISOR JAPAN, FIDELITY
ADVISOR KOREA, FIDELITY ADVISOR LARGE CAP,
FIDELITY ADVISOR LATIN AMERICA, FIDELITY ADVISOR
LEVERAGED CO STK, FIDELITY ADVISOR MID CAP,
FIDELITY ADVISOR MORTGAGE SECS, FIDELITY
ADVISOR MUNICIPAL INC, FIDELITY ADVISOR
NATURAL, FIDELITY ADVISOR OVERSEAS, FIDELITY
ADVISOR REAL ESTATE, FIDELITY ADVISOR SHORT
FIXED-INC, FIDELITY ADVISOR SMALL CAP, FIDELITY
ADVISOR STRAT GR, FIDELITY ADVISOR STRATEGIC
INCOME, FIDELITY ADVISOR TECHNOLOGY, FIDELITY
ADVISOR TELECOMM&UTIL GR, FIDELITY ADVISOR
VALUE STRAT, FIDELITY FLOATING RATE HIGH
INCOME,

No.    05-01205-GAF

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL
SECURITIES AND ANTITRUST
LAWS

**JURY TRIAL DEMANDED**

1

**COMPLAINT OF SECURITIES AND ANTITRUST VIOLATIONS**

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings as well as other regulatory filings and reports, press releases, and media reports about Fidelity Distributors Company and its practice of paying undisclosed fees to broker-dealers including ADP Broker-Dealer, Inc., out of the retirement investment accounts of its mutual fund holders. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal class action on behalf of a class consisting of all persons other than defendants who participated in Automatic Data Processing's Simple IRA retirement investments in Fidelity Advisor mutual funds (i.e., the Fidelity Advisor mutual funds as defined in the caption, above) between November 24, 1998 and January 15, 2004, inclusive, and who were damaged thereby. The Plaintiff seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), the Investment Advisers Act of 1940 (the "Investment Advisers Act"), The Sherman Antitrust Act and the Clayton Antitrust Act ( the "Robinson-Patman Act")(the "Class").

2. This action charges defendants with engaging in an unlawful and deceitful course of conduct designed to improperly financially advantage defendants to the detriment of the plaintiff and the other members of the Class. As part and parcel of defendants' unlawful conduct, Automatic Data Processing, Inc. and the Fund Defendants, as defined below, in clear contravention of their fiduciary responsibilities, and disclosure obligations, failed to properly disclose that retirement funds invested by Simple IRA customers into mutual funds were being paid as commercial bribes to their employer's outsourced payroll service and that no services were performed for the kickbacks, causing significant losses to the mutual fund holders.

3. On January 4, 2004 Automatic Data Processing, Inc. and Fidelity Distributors, Inc. disclosed for the first time to the Simple IRA/ Fidelity Advisor mutual fund holders that they had been deducting 3.5% for each new account and an additional .5% of their client's retirement savings in "administrative fees." This statement contradicted the $39.00 stated in the mutual fund prospectuses.

4. These funds were deducted without consent from Fidelity Advisor mutual fund investors and paid to Automatic Data Processing, Inc. to be the exclusive mutual fund company allowed to offer funds in Automatic Data Processing's Simple IRA retirement plans. All Simple IRA clients were required to invest their money in the tied financial products offered by Fidelity Advisor mutual funds. Automatic Data Processing is the largest

2

outsourced payroll and benefits services provider in the U.S., having 1/6[th] of the market with no other measurable competition. Fidelity is the largest U.S. mutual fund company.

## JURISDICTION AND VENUE

5.        This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa); Section 22 of the Securities Act (15 U.S.C. § 77v); Section 80b-14 of the Investment Advisers Act (15 U.S.C. § 80b-14); and 28 U.S.C. §§ 1331, 1337.

6.        This Court has jurisdiction over the subject matter of this action pursuant to the Sherman and Clayton Antitrust Acts, 15 U.S.C. § 1 and 15 U.S.C. § 13 (c).

7.        Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Defendants conducted other substantial business within this District and many Class members reside within this District.

8.        In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9.        Plaintiff Donna Huffman, as set forth in her certification, which is attached hereto and incorporated by reference herein, purchased units of the ADP brokered Fidelity Mutual Funds during the Class Period and has been damaged thereby. Donna Huffman resides at 122 Vista View, Ozawkie, KS 66070.

10.        Automatic Data Processing, Inc., (ADP) a New Jersey based, Delaware corporation is the ultimate parent of all ADP Defendants as defined herein. Through its member firms, which include ADP Broker-Dealer, Inc. and its defendant employees; Arthur F. Weinbach CEO, Russell P. Fradin Employer Services Group President and the defendant broker James P. Blake. Automatic Data Processing, Inc., is headquartered at One ADP Boulevard, Roseland, New Jersey, 07068.

11.        ADP Broker-Dealer, Inc. is the subsidiary corporate entity created and owned by Automatic Data Processing, Inc., for the purposes of being a licensed securities broker dealer. ADP Broker-Dealer, Inc. is headquartered at One ADP Boulevard, Roseland, New Jersey, 07068.

12.        Arthur F. Weinbach, is the CEO of Automatic Data Processing, Inc. and has his office at One ADP Boulevard, Roseland, New Jersey, 07068.

13.        Russell P. Fradin is the group president of ADP's Employer Services division. Russell P. Fradin has his office at One ADP Boulevard, Roseland, New Jersey, 07068.

3

14.     James P. Blake, the defendant broker is the licensed broker dealer employed by ADP Broker-Dealer, Inc. James P. Blake has his office at One ADP Boulevard, Roseland, New Jersey, 07068.

15.     Deloitte & Touche LLP is the independent public accounting firm that acted as auditor over quarterly and annual statements of Automatic Data Processing, Inc. and its subsidiary and employee defendants during the complained of period. Its headquarters are at 1633 Broadway, New York, N.Y. 10019-6754.

16.     Fidelity Distributors, Inc. ("FIDELITY") a Massachusetts based financial services firm and the ultimate parent of all Fidelity Defendants, as defined herein does business in the forum state at Fidelity Distributors Corp. Fidelity Mutual Fund IRA c/o UMB Bank, N.A. 1008 Oak Street ACH Dept. Kansas City, MO 64106 and is headquartered at 82 Devonshire Street, Boston, MA 02109.

17.     Fidelity Management & research Company, ("FMR") is a subsidiary of Fidelity Distributors, Inc. ("FIDELITY"). a Massachusetts based financial services firm and the ultimate parent of all Fidelity Defendants, as defined herein.  Through its member firms, which include Fidelity Investments Institutional Operations Company, Inc. ("FIIOC")  and Fidelity Management Trust Company, ("FMTC"), Fidelity Management & Research Company provides asset management services and products in the United States. Fidelity Management& Research Company,is headquartered at 82 Devonshire Street, Boston, MA 02109.

18.     Fidelity Investments Institutional Operations Company, Inc. ("FIIOC") is a subsidiary of Fidelity Distributors, Inc. ("FIDELITY") and is headquartered at  82 Devonshire Street, Boston, MA 02109

19.     Edward C. Johnson 3rd, is Chairman and Chief Executive Officer of Fidelity Distributors, Inc. ("FIDELITY") and has his office at 82 Devonshire Street, Boston, MA 02109.

20.     Fidelity Management Trust Company, is a subsidiary of Fidelity Distributors, Inc. ("FIDELITY") and is headquartered at 82 Devonshire Street, Boston, MA 02109.

21.     Each of the Fidelity Advisor Mutual Funds ( collectively "FIDELITY ADVISOR mutual funds") are mutual funds that are regulated by the Investment Company Act of 1940 that are managed by defendant Fidelity Management & research Company, ("FMR") and that buy, hold, and sell shares or other ownership units that are subject to the misconduct alleged in this complaint. Each Fidelity Advisor Mutual Fund is headquartered at 82 Devonshire Street, Boston, MA, 02109.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

22.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased or otherwise acquired shares or like interests in any of the ADP brokered FIDELITY Mutual Funds between November 24, 1998 and November 12, 2003, inclusive, and who were damaged thereby.  Plaintiffs and each of the Class members purchased

4

shares or other ownership units in ADP brokered FIDELITY Mutual Funds pursuant to a registration statement and prospectus. The registration statements and prospectuses pursuant to which plaintiffs and the other Class members purchased their shares or other ownership units in the ADP brokered FIDELITY Mutual Funds are referred to collectively herein as the "Prospectuses." Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

23.       The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the ADP brokered FIDELITY Mutual Funds and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.       Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

25.       Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in complex litigation.

26.       Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by defendants' acts as alleged herein; (b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and financial statements of the ADP brokered FIDELITY Mutual Funds; (c) whether the federal securities laws were violated by defendants' acts as alleged herein; and (d) to what extent the members of the Class have sustained damages and the proper measure of damages.

27.       A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Introduction: The Special Mutual Funds For Defrauding Retirement Accounts

28.        Simple-IRAs are a congress provided incentive under the U.S. Tax code for employers of one hundred or fewer employees to set up payroll contribution plans for employees to invest in individual retirement accounts with deferred taxation. The plan also provides incentives for employers to contribute to their employees' retirements. In the private sector of the economy, pensions have largely been eliminated and Simple-IRA's and 401K plans with some degree of employee self direction are now believed by policy makers and employees to be more sound and secure than employer managed funds like traditional pensions.

29.        The perceived security of Simple-IRA investment retirement accounts results from popular acceptance of mutual funds, called investment companies by the Securities and Exchange Commission. The mutual funds which are required by SEC regulation to be heavily diversified and managed by a board of directors in a trustee capacity. The blue sky and pump and dump schemes that characterize the marketing of single stocks in the eyes of the public are believed to be absent from decision making in the management of mutual funds.

30.        As the nation's largest outsourced payroll processor, ADP has an interest in offering payroll retirement contribution plans to meet the demands of its clients, the employers and employees that use its services. ADP prints the paychecks for over 1/6[th] of the nation's private sector workforce.  FIDELITY is the nation's largest group of mutual funds. Some of FIDELITY's funds have been praised in consumer and trade publications for having high rates of return, having stability or in providing income. Many of FIDELITY's mutual fund products are good values and meet the needs of consumers in a competitive national market.

31.        ADP's clients in companies of one hundred or fewer employees were happy to have the opportunity to participate in an ADP Simple-IRA where their savings would be invested in FIDELITY mutual funds. The FIDELITY prospectuses for these funds distributed by ADP to its clients did not distinguish the funds available through ADP Simple-IRA as being different from the mutual funds with identical or substantially similar names advertised by FIDELITY.

**What was not Disclosed to the Plaintiff and Other Members of The Class**

32.        However, unbeknownst to investors, from at least as early as November 24, 1998 and until January, 14th 2004, inclusive, defendants engaged in fraudulent and wrongful schemes that enabled ADP to collect kickbacks called soft dollars for marketing the funds. These soft dollars were part of a payola scheme to "buy shelf space" from broker-dealers so that a particular mutual fund company could encourage independent brokers to actively inform potential customers about that fund's products in addition to the products of other mutual fund companies represented by the independent brokers. However, ADP carried the products of no other mutual fund companies and none of its employees actively represented any investment products by performing the education and advising function of securities brokers. FIDELITY'S soft dollars to ADP were a naked payoff to

6

prevent competition, allowing FIDELITY to profit from inefficiencies in price and performance where customers had no opportunity to compare FIDELITY'S products with those of other funds, and where ADP was compensated handsomely by FIDELITY for not educating and advising its Simple-IRA customers of alternatives to the pre-selected FIDELITY ADVISOR "t" funds.

33.     Fidelity Mutual Funds paid the kickbacks or soft dollars as administration fees to ADP's broker-dealer entity ADP BROKER-DEALER, INC. through the securities licensed broker JAMES P. BLAKE even though all marketing and sales brochures, publications, web pages and prospectuses stated ADP, ADP BROKER-DEALER, INC. and JAMES P. BLAKE were not providing legal, tax or investment advice and would not do so.

34.     The soft dollars or kickbacks ADP, its subsidiaries and employees received from FIDELITY were substantial, even though ADP performed no advisory services to its customers, the undisclosed percentage taken from the contributions of ADP Simple IRA clents was 3.5%, in excess of a reasonable investment administration fee legitimately charged by fund managers actively managing and supervising the operation of investment fund groups, an activity ADP, its subsidiaries and employees never performed.

35.     In addition to the excessive 3.5% taken without disclosure from its clients' savings contributions, ADP skimmed ( or was paid by FIDELITY )another excessive .5% each month on the balance of the retirement savings its clients held in their ADP Simple IRA accounts.

**The Purchase of "Shelf Space"**

36.     A Reuters News Service story dated January, 13, 2004 reported The U.S. Securities and Exchange Commission said it found the sale of mutual funds was abused at 13 brokerages targeted in a probe. The unnamed firms took cash payments in return for favoring the sale of certain funds, in violation of SEC and National Association of Securities Dealers rules. The Reuters story stated that at the heart of the expanding probe into conflicts of interest between mutual fund companies and brokerages is whether customers have been fully informed of the fees brokers receive for offering a "preferred list" of funds.

37.     The Reuters story reported that in a similar case, Morgan Stanley agreed to a $50 million settlement in November when the SEC and NASD said the brokerage had failed to properly inform investors about compensation it received for selling certain funds. Reuters also cited A Wall Street Journal article from the previous week that stated Edward Jones, a major mutual fund distributor or "broker-dealer", receives hefty payments -- $100 million a year according to one estimate -- from mutual fund companies to push their funds with customers.

38.     A USA Today article on January 14th, 2004 described the SEC's characterization of the payments to

broker-dealers as "secret kickbacks from certain mutual funds for pointing clients to those funds, even though the funds may produce lower returns and charge higher fees than other investments."

39.    The San Francisco Chronicle in an article entitled "Scorecard in funds scandal" published on Sunday, January 25, 2004 "The SEC charged Morgan Stanley with failing to properly disclose that its brokerage division accepted such payments from more than a dozen mutual fund companies. Morgan Stanley settled the charges. The mutual funds that paid Morgan Stanley's program include;… Fidelity,..."

40.    On Sunday, January 18th, 2004, The Wall Street Journal in an article entitled "Pay to Play" described the mutual fund payments to brokers as "a little-understood fund-sales practice now under scrutiny by federal securities regulators. In the industry it's known by the bland name of 'revenue sharing': Fund companies give brokers a cut of their management fees to induce them to sell their products. Critics call it 'pay to play.' 'The deception is that the broker seems to give objective advice,' says Tamar Frankel, a law professor at Boston University who specializes in mutual-fund regulation. 'In fact, he is paid more for pushing only certain funds." The Wall Street Journal article explains that the regulatory authority has begun a criminal investigation of mutual fund payments to brokers "…the Securities and Exchange Commission said it has begun eight inquiries involving brokerages and 12 involving mutual fund companies alleged to be involved in illegal revenue sharing, according to SEC Enforcement Director Stephen Cutler." The Wall Street Journal further reports: "The nation's 50 largest mutual-fund groups quietly dole out $1.5 billion annually in revenue-sharing payments to brokers, according to an estimate by Financial Research Corp., a Boston fund-tracking firm. Fidelity Investments, [ FIDELITY] the largest fund firm, says it makes such payments for its broker-sold funds, but declines to elaborate." [emphasis added]

**Retirement Skimming Through Excessive Fees**

41.    Sen. Peter Fitzgerald, R-Ill has called the mutual fund industry ``the world's largest skimming operation,'' complaining fees swallow too big a chunk of Americans' portfolios and stating `Investors and consumers are being bled drop by drop.''

42.    In a Bloomburg New Service November 23rd, 2003 story entitled "Investors' Mutual Fund Fees Excessive" the wire service reports "Americans who own stock mutual funds are charged annual management fees of about $18 billion, twice the amount they should be paying, according to data shared by state and federal regulators investigating the industry. Individuals pay $56 in fees for every $10,000 in equity mutual funds, double the $28 paid by institutional investors in stock funds, said John Freeman, a professor at the University of South Carolina and one of the principle sources of data on mutual funds for New York State Attorney General Eliot Spitzer…Individuals should be paying similar levels of fees as institutional investors, according to Spitzer, who initiated the investigation of the $7 trillion mutual-fund industry in September… Stock, bond and money-market

mutual funds have more assets than the $5.9 trillion in public and private pension funds combined, and the amount of work involved in managing the accounts is similar, making it impossible to justify the fee differential, Spitzer said.

43.     The January 24th, 2004 edition of the Seattle Times published an article entitled "Study: Hidden fees boost price of biggest mutual funds by 43 percent" The Seattle Times printed; "The hidden costs of owning the 30 largest retail mutual funds would increase their published expenses by an average of 43 percent, according to a study released yesterday by shareholder advocates." The study, by Wake Forest University and University of Florida professors, measured the impact of the funds' brokerage commissions and related costs in 2001 as they bought and sold securities on behalf of investors" The study cited by the Seattle Times found a particular Fidelity Fund had conspicuously high undisclosed fees; "Among the 30 largest funds, trading costs would have almost doubled Fidelity Contrafund's expense ratio of 0.84 percent."

### The Defendant Combination or Conspiracy

44.     ADP is the nation's largest outsourced human resources service provider, and calls itself "the world's leading provider of integrated payroll, human resources and benefits administration services."  ADP has over 60% of the U.S. outsourced payroll market. This market monopoly power puts ADP in a special relationship with employers and human resources managers at 460,000 firms making decisions about employee benefits including payroll retirement investments encouraged by the U.S. Tax code. ADP is in a unique position to exercise this power, which includes printing one sixth of the private sector payroll checks issued in America. No other competitor has a measurable market share.

45.     FIDELITY is the world's largest mutual fund company, managing more than $950 billion in mutual fund assets for over 15 million investors. In February 2003, FIDELITY had 9% of the U.S. Equity and Fixed income funds market.

46.     ADP and FIDELITY have openly combined to leverage their respective monopoly power in the outsourced human resources services market and the mutual fund market to monopolize the relevant market for Simple IRA employer provided mutual funds. ADP and FIDELITY have over 70% of the US market for Simple IRA account mutual funds in outsourced payroll/human resources services.

### The Defendant Combination's Fraudulent Scheme

47.     FIDELITY combined with ADP, conspiring with the employer services business to keep small business employers from having the ability to offer Simple IRA mutual funds from other mutual fund companies. In return for an excessive 3.5% administration fee and skimming .5% monthly off employees retirement investments as a commercial bribe in undisclosed payments in violation of Sections 10(b) and 20(a) of the

9

Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, to ADP BROKER-DEALER, INC. and JAMES P. BLAKE for investment advice services they did not provide their clients, ADP would assist FIDELITY by substituting a selection of poor performing mutual funds that were exposed to equity risk and deprived of an offsetting rate of return, even less than the interest return of secure bank savings accounts for their good faith expectations of choice and value based on FIDELITY's prospectuses distributed by ADP. ADP, ADP BROKER-DEALER, INC. and JAMES P. BLAKE breached their fiduciary duties to their employer and employee clients who held Simple IRA accounts nakedly restraining competition, for the purpose of defrauding and injuring small business employees by depriving them of the value of their retirement savings as consumers of financial products.

48.     ADP and FIDELITY excluded the products of other mutual fund companies from the relevant market of ADP U.S. out sourced payroll accounts for client companies of one hundred or fewer employees in a per se restraint of trade, violating 15 U.S.C.§1.

49.     ADP and FIDELITY tied the inferior products of FIDELITY Advisor funds to the ADP Simple-IRA in the relevant market of ADP U.S. out sourced payroll accounts for client companies of one hundred or fewer employees in a per se restraint of trade, violating 15 U.S.C.§1.

50.     ADP accepted and FIDELITY paid commercial bribes to exclude the products of other mutual fund companies from the relevant market of ADP U.S. out sourced payroll accounts for client companies of one hundred or fewer employees in a per se restraint of trade, violating 15 U.S.C.§13 (c).

51.     Neither the combination and or conspiracy created by ADP and FIDELITY, nor the scheme to restrain trade by paying ADP not to offer Simple IRA accounts with other mutual fund companies, nor the scheme to tie ADP Simple IRAs exclusively to only FIDELITY mutual funds is expressly regulated by the Securities and Exchange Commission and no implied immunity from antitrust law exists.

**The January  5, 2004 Revelation of the Defendants' Securities Fraud**

52.     Clients of ADP's Simple IRA, believed to number over 85,000 American workers, first received notice of the fraudulent deception fostered on them by the defendants when they received via online reports and published FIDELITY annual reports to fund holders disclosing for the first time the fees paid to ADP. FIDELITY had become concerned by the class action lawsuits and state attorneys generals investigations into aspects of mutual fund distribution ignored by the Securities and Exchange Commission described above and feared their past illegal failure to disclose their commercial bribery for "shelf space" would result in civil prosecutions. To limit the scope of liability, FIDELITY resolved to begin reporting and disclosing the payments it made to broker-dealers for pushing its funds, including payments made to ADP.

53.      These reports dated January 1, 2004 showed unexpected losses in ADP's clients' Simple IRA investments and savings fund accounts. Hundreds of ADP clients started to call the FIDELITY and ADP customer services telephone numbers questioning how the funds had lost money and why the steep sales commissions had not been disclosed. Some clients had the financial services professional experience and recognized that the money losing funds shown in their account statements were not the non-money losing FIDELITY funds with identical or substantially similar names they had followed in daily newspaper and internet site market quotes and that funds they requested were not listed in their account statements.

54.      The plaintiff through her counsel gave notice of a class action claim to the defendants in letters dated February 26, 2004 to ADP and FIDELITY, and on April 7, 2004 to DELOITTE TOUCHE LLP. Jody E. Forchheimer of FIDELITY answered on March 3, 2004 stating the claims were "materially incorrect" but did not explain further. Barrie Prinz answered for DELOITTE TOUCHE LLP on April 30 2004 disputing the facts in the complaint as inaccurate and denying any basis for a claim against DELOITTE TOUCHE LLP. Catherine A. Carr responded on behalf of ADP providing prospectuses she claimed fully disclosed the sales charges for T-funds in 2001, 2002 and 2003. Other members of the class contacted the defendants independently, receiving denials of wrong doing in how the funds were represented and managed. All of these calls, emails and letters are recorded and maintained by ADP and FIDELITY for their clients in this and future legal actions against ADP and FIDELITY. FIDELITY's bribes, kickbacks or shelf space fees were not disclosed. The defendants also did not disclose that they had broken the law. On December 22, 2004, The Securities and Exchange Commission, NASD and the New York Stock Exchange announced settled enforcement proceedings against Edward D. Jones & Co., L.P., a registered broker-dealer headquartered in St. Louis, Missouri, related to allegations that Edward Jones failed to adequately disclose revenue sharing payments that it received from a select group of mutual fund families that Edward Jones recommended to its customers. Edward Jones' conduct in not disclosing the shelf space payments it received for a particular family of funds, like that of the defendant ADP in concealing from the plaintiff and the class shelf space payments had been held out by the FIDELITY defendants, DELOITTE TOUCHE LLP and  ADP as not being actionable under federal securities law.

### The Mechanics of the Defendants' Securities Fraud

55.      To deceive its employer and employee clients, ADP distributed a special brochure entitled "SIMPLE IRA Voice Response System (VRS) Reference Guide" with the corporate logos of ADP and FIDELITY INVESTMENTS on the cover. ADP and FIDELITY also maintained a website for ADP Simple-IRA customers. Both the brochure and website listed only FIDLITY ADVISOR funds, having no provision in their software for selecting funds from other mutual fund companies besides FIDELITY and unknown to ADP's employer and

employee clients, neither the Voice Response System or the web site had any provision for selecting the non fraudulent FIDELITY mutual funds ADP's clients thought they were receiving. Both systems steered ADP's clients into "t" funds with the same name as legitimate FIDLITY ADVISOR funds, but having the accounting system designed to conceal the commercial bribes paid to ADP as fund losses and fraudulently failing to disclose the excessive fees on the automated ADP system that reported payroll information including retirement benefits to ADP's clients and fraudulently failing to disclose until January 1, 2004 the excessive fees in FIDELITY's reporting to its ADP's client customers.

56.     ADP client customers who called human customer service representatives of ADP faired no better. The customer reps entered their orders on the same software, placing the ADP client employees and employers orders into the same list of FIDLITY ADVISOR "t" funds, even when the callers identified and requested legitimate FIDELITY funds which were not on the list. ADP's customer service representatives would lie and state the customer's initial Simple-IRA deposit was being placed in the identified high performing fund, such as the FIDELITY GNMA fund when no GNMA based FIDELITY ADVISOR fund existed and unbeknown to the customer, the money, after the excessive fees or kickbacks had been skimmed would show up in the clients account under one of the FIDELITY ADVISOR "t" funds.    When ADP clients called FIDELITY, they were refused assistance and referred to ADP's Simple-IRA customer service line.

**The Prospectuses Were Materially False and Misleading**

57.     The Simple-IRA prospectuses distributed by ADP were materially false and misleading. The prospectus, entitled "Employee Enrollment Kit" was given to employers of one hundred people or fewer by ADP to distribute to their employees. The prospectus had the corporate logos of ADP and FIDELITY INVESTMENTS on the cover and the title stated: "The Advisor Retirement Connection ® - Simple IRA Presented by ADP & FIDELITY INVESTMENTS."  On page four of the prospectus, in a section where the advertising copy lists questions and answers, a question asks:

> "Q. Is there a cost for me to join the plan?"
>
> "A. No. There is no cost for joining the plan. However, there is an annual fee of $15 base custodial fee with an additional $12 custodial fee for each mutual fund in your SIMPLE IRA, ( up to a maximum of two funds), with an overall maximum annual fee of $39. Once the total balance of all your Fidelity funds maintained by FIIOC exceeds $30,000, the $12 per fund custodial fee will be waived. For a complete list of fees and expenses please refer to the statement of fees." [emphasis added]

58.     At the referred disclosure of fees, no fees connected with the sales load, distribution or broker commissions are disclosed. All fees refer to the custodial agreement for maintaining and distributing the proceeds of the funds to beneficiaries. The omission of disclosing even one penny per share has been deemed material securities fraud. The New York Attorney General, Elliot Spitzer has stated that excessive undisclosed

Case 4:05-cv-01205-GAF   Document 1   Filed 11/30/05   Page 12 of 25

fees in the 3% range can lead to a loss of $6000 over the life on a retirement mutual fund account. No client of ADP can ascertain from the defendants prospectuses and brochures that a 3.5% advisory fee is being skimmed by ADP, or that each month, an additional .5% is being skimmed from the client's retirement savings.

59.     The prospectuses do not disclose that the ADP clients' employer and employee investments are being placed in a special segregated group of poorly performing FIDELITY ADVISOR funds and not the regular legitimate FIDELITY funds their independent research and diligence would mistakenly lead them to conclude, an intended result of the deception.

## VIOLATIONS OF THE SECURITIES ACT

### FIRST CLAIM

#### Against Fidelity Management & Research For Violations
#### of Section 11 Of The Securities Act

60.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set fort herein, except that, for purposes of this claim, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct and otherwise incorporates the allegations contained above.

61.     This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class against FMR.

62.     FMR is the registrant for one or more the fund shares sold to plaintiffs and the other members of the Class and is statutorily liable under Section 11.

63.     FMR issued, caused to be issued and participated in the issuance of the materially false and misleading written statements and/or omissions of material facts that were contained in the Prospectuses.

64.     Prior to purchasing units of the FIDELITY ADVISOR mutual funds, the plaintiff was provided the appropriate Prospectus and, similarly, prior to purchasing units of each of the other FIDELITY ADVISOR mutual funds, all Class members likewise received the appropriate prospectus.  The Plaintiff and other Class members purchased shares of the FIDELLITY ADVISOR mutual funds traceable to the false and misleading Prospectuses.

65.     As set forth herein, the statements contained in the Prospectuses were materially false and misleading for a number of reasons, including (a) misrepresenting the fees charged to open an account investing in the funds, (b) misrepresenting the fees charged to maintain the funds accounts, (c) misrepresenting the performance of the funds and their ability to accumulate return when the stock trading commissions paid by the fund's management were excessive,  and (d) the Prospectuses failed to disclose that, pursuant to the unlawful agreements, the Fund Defendants benefited financially at the expense of the FIDELITY ADVISOR mutual funds investors.

66.        Plaintiffs and the Class have sustained damages. The value of the FIDELITY ADVISOR mutual funds shares decreased substantially subsequent to and due to defendants' violations.

67.        At the time they purchased the FIDELITY ADVISOR mutual funds shares traceable to the defective Prospectuses, plaintiffs and Class members were without knowledge of the facts concerning the false and misleading statements or omission alleged herein and could not reasonably have possessed such knowledge. This claim was brought within the applicable statute of limitations.

**SECOND CLAIM**

**Against Fidelity Distributors Company ( FIDELITY) and Fidelity Management & Research Company (FMR) as a Control Person of Fidelity Advisor Mutual Funds For Violations of Section 15 of the Securities Act**

68.        The Plaintiff repeats and realleges each and every allegation contained above, except that for purposes of this claim, the plaintiff expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional reckless misconduct and otherwise incorporates the allegations contained above.

69.        This Claim is brought pursuant to Section 15 of the Securities Act against FIDELITY and FMR, as control persons of FIDELITY ADVISOR mutual funds. It is appropriate to treat these defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the FIDELITY ADVISOR mutual funds' Prospectuses, public filings, press releases and other publications are the collective actions of FIDELITY and FMR.

70.        FIDELITY ADVISOR mutual funds are liable under Section 11 of the Securities Act as set forth herein.

71.        Both FIDELITY and FMR were a "control person" of FIDELITY ADVISOR mutual funds within the meaning of Section 15 of the Securities Act, by virtue of its position of operational control and/or authority over FIDELITY ADVISOR mutual funds -- FIDELITY and FMR directly and indirectly, had the power and authority, and exercised the same, to cause FIDELITY ADVISOR mutual funds to engage in the wrongful conduct complained of herein.  FIDELITY and FMR issued, caused to be issued, and participated in the issuance of materially false and misleading statements in the Prospectuses.

72.        Pursuant to Section 15 of the Securities Act, by reason of the foregoing, FIDELITY and FMR are liable to plaintiffs to the same extent as FIDELITY ADVISOR mutual funds for their primary violations of Section 11 of the Securities Act.

73.        By virtue of the foregoing, the plaintiff and other Class members are entitled to damages against FIDELITY and FMR.

## VIOLATIONS OF THE EXCHANGE ACT

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE MARKET DOCTRINE

74.     At all relevant times, the market for FIDELITY Mutual Funds were an efficient market for the following reasons, among others: (a) The FIDELITY Mutual Funds met the requirements for listing, and were listed and actively bought and sold through a highly efficient and automated market; (b) As regulated entities, periodic public reports concerning the FIDELITY Mutual Funds were regularly filed with the SEC; (c) Persons associated with the FIDELITY Mutual Funds regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (d) The FIDELITY Mutual Funds were followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

75.     As a result of the foregoing, the market for the FIDELITY Mutual Funds promptly digested current information regarding FIDELITY Mutual Funds from all publicly available sources and reflected such information in the respective FIDELITY Mutual Funds' Net Asset Value.  Investors who purchased or otherwise acquired shares or interests in the FIDELITY Mutual Funds relied on the integrity of the market for such securities.  Under these circumstances, all purchasers of the FIDELITY Mutual Funds during the Class Period suffered similar injury through their purchase or acquisition of FIDELITY Mutual Funds securities at distorted prices that did not reflect the risks and costs of the continuing course of conduct alleged herein, and a presumption of reliance applies.

### THIRD CLAIM

### Violation Of Section 10(b) Of The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

76.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein except for Claims brought pursuant to the Securities Act.

77.     During the Class Period, each of the defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including plaintiff and other Class members, as alleged herein and cause plaintiff and other members of the Class to purchase ADP Simple IRA FIDELITY ADVISOR Mutual Funds shares or interests without knowledge of the excessive fees secretly being paid to ADP BROKER-DEALER, INC. and JAMES P. BLAKE which skimmed the investment

15

returns of the funds and caused the plaintiff and the Class to otherwise suffer damages. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

78. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the ADP Simple IRA FIDELITY ADVISOR Mutual Funds' securities, including the plaintiff and other members of the Class, in an effort to enrich themselves through undisclosed manipulative marketing tactics by which they wrongfully appropriated ADP Simple IRA FIDELITY ADVISOR Mutual Funds' assets and deceived the plaintiff and the Class about the value and performance of their securities in violation of Section 10(b) of the Exchange Act and **Rule 10b-5.** All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

79. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the ADP Simple IRA FIDELITY ADVISOR Mutual Funds' operations, as specified herein.

80. These defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate the plaintiff and the Class into purchasing substituted poor performing FIDELITY ADVISOR Funds for the legitimate FIDELITY funds they thought they were receiving and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the plaintiff and members of the Class.

81. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

82. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ADP Simple IRA FIDELITY ADVISOR Mutual Funds securities were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein. In ignorance of these facts that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made by the Fund Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by

16

defendants during the Class Period, plaintiffs and the other members of the Class acquired the shares or interests in the ADP Simple IRA FIDELITY ADVISOR Mutual Funds during the Class Period at distorted prices and were damaged thereby.

83.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and other members of the Class and the marketplace known of the truth concerning the ADP Simple IRA FIDELITY ADVISOR Mutual Funds' operations, which were not disclosed by defendants, the plaintiff and other members of the Class would not have purchased or otherwise acquired their shares or, if they had acquired such shares or other interests during the Class Period, they would not have done so at the distorted prices which they paid.

84.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

85.    As a direct and proximate result of defendants' wrongful conduct, the plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the ADP Simple IRA FIDELITY ADVISOR Mutual Funds shares during the Class Period.

**FOURTH CLAIM**

**Against Fidelity Distributors, Inc. (FDC) (as a control person of  Fidelity Management & Research Company, ("FMR"); Fidelity Management Trust Company ("FMTC"); Fidelity Advisor Funds, and the ADP Simple IRA Fidelity Advisor Mutual Funds); Fidelity Management & Research Company, ("FMR") (as a control person of Fidelity Management Trust Company ("FMTC"); Fidelity Advisor Funds; ADP Simple IRA Fidelity Advisor Mutual Funds); Fidelity Management Trust Company ("FMTC") as a control person of Fidelity Advisor Funds and the ADP Simple IRA Fidelity Advisor Mutual Funds; and Fidelity Advisor Funds (as a control person of the ADP Simple IRA Fidelity Advisor Mutual Funds)**
**For Violations of Section 20(a) of the Exchange Act**

86.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for Claims brought pursuant to the Securities Act.

87.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against FIDELITY DISTRIBUTORS, INC., as a control entity of FIDELITY MANAGEMENT & RESEARCH COMPANY, ("FMR"); FIDELITY MANAGEMENT TRUST COMPANY ("FMTC"); FIDELITY ADVISOR Funds, and the ADP Simple IRA FIDELITY ADVISOR Mutual Funds; and FIDELITY MANAGEMENT & RESEARCH COMPANY, ("FMR") as a control entity of FIDELITY MANAGEMENT TRUST COMPANY ("FMTC"); FIDELITY ADVISOR Funds; ADP Simple IRA FIDELITY ADVISOR Mutual Funds and FIDELITY MANAGEMENT TRUST COMPANY ("FMTC") as a control entity of FIDELITY ADVISOR Funds and the ADP Simple IRA FIDELITY ADVISOR Mutual Funds; and the FIDELITY ADVISOR Funds as a control entity of the ADP Simple IRA FIDELITY ADVISOR Mutual Funds.

88.    It is appropriate to treat these defendants as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the ADP Simple IRA FIDELITY ADVISOR

17

Mutual Funds' public filings, press releases and other publications are the collective actions of FIDELITY DISTRIBUTORS, INC., FIDELITY MANAGEMENT & RESEARCH COMPANY, ("FMR"); FIDELITY MANAGEMENT TRUST COMPANY ("FMTC"), FIDELITY ADVISOR Funds.

89.     Each of FIDELITY DISTRIBUTORS, INC., FIDELITY MANAGEMENT & RESEARCH COMPANY, ("FMR"); FIDELITY MANAGEMENT TRUST COMPANY ("FMTC"), and FIDELITY ADVISOR Funds acted as controlling entities of the ADP Simple IRA FIDELITY ADVISOR Mutual Funds within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their operational and management control of the ADP Simple IRA FIDELITY ADVISOR Mutual Funds' respective businesses and systematic involvement in the fraudulent scheme alleged herein, FIDELITY DISTRIBUTORS, INC., FIDELITY MANAGEMENT & RESEARCH COMPANY, ("FMR"); FIDELITY MANAGEMENT TRUST COMPANY ("FMTC"), and FIDELITY ADVISOR Funds each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of the ADP Simple IRA FIDELITY ADVISOR Mutual Funds, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. FIDELITY DISTRIBUTORS, INC., FIDELITY MANAGEMENT & RESEARCH COMPANY, ("FMR"); FIDELITY MANAGEMENT TRUST COMPANY ("FMTC"), and FIDELITY ADVISOR Funds had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

90.     In particular, each of FIDELITY DISTRIBUTORS, INC., FIDELITY MANAGEMENT & RESEARCH COMPANY, ("FMR"); FIDELITY MANAGEMENT TRUST COMPANY ("FMTC"), and FIDELITY ADVISOR Funds had direct and supervisory involvement in the operations of the ADP Simple IRA FIDELITY ADVISOR Mutual Funds and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

91.     As set forth above, FIDELITY DISTRIBUTORS, INC., FIDELITY MANAGEMENT & RESEARCH COMPANY, ("FMR"); FIDELITY MANAGEMENT TRUST COMPANY ("FMTC"), and FIDELITY ADVISOR Funds each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling entities, FIDELITY DISTRIBUTORS, INC., FIDELITY MANAGEMENT & RESEARCH COMPANY, ("FMR"); FIDELITY MANAGEMENT TRUST COMPANY ("FMTC"), and FIDELITY ADVISOR Funds are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of ADP Simple IRA FIDELITY ADVISOR Mutual Funds securities during the Class Period.

## VIOLATIONS OF THE INVESTMENT ADVISERS ACT

**FIFTH CLAIM**

**For Violations of Section 206 of The Investment Advisers Act of 1940
Against Fidelity Investments [15 U.S.C. §80b-6 and 15 U.S.C. §80b-15]**

92.        Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

93.        This Count is based upon Section 215 of the Investment Advisers Act, 15 U.S.C. §80b-15. 28 83.

94.        FIDELITY INVESTMENTS (FIDELITY DISTRIBUTORS COMPANY or FDC) served as an "investment adviser" to the plaintiff and other members of the Class pursuant to the Investment Advisers Act.

95.        As a fiduciary pursuant to the Investment Advisers Act, FIDELITY INVESTMENTS was required to serve the plaintiff and other members of the Class in a manner in accordance with the federal fiduciary standards set forth in Section 206 of the Investment Advisers Act, 15 U.S.C. §80b-6, governing the conduct of investment advisers.

96.        During the Class Period, FIDELITY INVESTMENTS breached its fiduciary duties owed to the plaintiff and the other members of the Class by engaging in a deceptive contrivance, scheme, practice and course of conduct pursuant to which it knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon the plaintiff and other members of the Class.  As detailed above, FIDELITY INVESTMENTS allowed defendants ADP, ADP BROKER-DEALER, INC., ADP INVESTOR COMMUNICATION SERVICES, INC., ARTHUR F. WEINBACH, RUSSELL P. FRADIN and JAMES P. BLAKE to secretly skim undisclosed kickbacks from the opening and maintenance of ADP Simple IRA FIDELITY ADVISOR Mutual Funds shares.  The purposes and effect of said scheme, practice and course of conduct was to enrich FIDELITY INVESTMENTS, among other defendants, at the expense of plaintiffs and other members of the Class.

97.        FIDELITY INVESTMENTS breached its fiduciary duties owed to plaintiffs and other Class members by engaging in the aforesaid transactions, practices and courses of business knowingly or recklessly so as to constitute a deceit and fraud upon plaintiffs and the Class members.

98.        FIDELITY INVESTMENTS is liable as a direct participant in the wrongs complained of herein. FIDELITY INVESTMENTS, because of its position of authority and control over the ADP Simple IRA FIDELITY ADVISOR Mutual Funds shares was able to and did:  (1) control the content of the Prospectuses; and (2) control the operations of the FIDELITY ADVISOR Mutual Funds which as a policy and practice of FIDELITY INVESTMENTS paid undisclosed kickbacks as commercial bribes to the ADP defendants from the investment accounts of the plaintiff and other members of the class.

99.        FIDELITY INVESTMENTS had a duty to (1) disseminate accurate and truthful information with respect to the ADP Simple IRA FIDELITY ADVISOR Mutual Funds; and (2) truthfully and uniformly act in

19

accordance with its stated policies and fiduciary responsibilities to plaintiffs and members of the Class. FIDELITY INVESTMENTS participated in the wrongdoing complained of herein in order to prevent plaintiffs and other members of the Class from knowing of FIDELITY INVESTMENTS' breaches of fiduciary duties including: (1) increasing its profitability at plaintiffs' and other members of the Class' expense by allowing defendants ADP, ADP BROKER-DEALER, INC., ADP INVESTOR COMMUNICATION SERVICES, INC., ARTHUR F. WEINBACH, RUSSELL P. FRADIN and JAMES P. BLAKE to secretly skim undisclosed kickbacks from the opening and maintenance of ADP Simple IRA FIDELITY ADVISOR Mutual Funds shares; and (2) placing its interests ahead of the interests of plaintiffs and other members of the Class.

100.        As a result of FIDELITY INVESTMENTS' multiple breaches of its fiduciary duties owed the plaintiff and other members of the Class, plaintiffs and other Class members were damaged.

101.        The Plaintiff and other Class members are entitled to rescind their investment advisory contracts with FIDELITY INVESTMENTS and recover all fees paid in connection with their enrollment pursuant to such agreements.

## VIOLATIONS OF THE SHERMAN ANTITRUST ACT
## SIXTH CLAIM

**For Violations of Section 1 of The Sherman Antitrust Act for Group Boycott against Automatic Data Processing, Inc. and Fidelity Management & Research Company, ("FMR") [15 U.S.C. §1]**

102.        Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging securities violations and otherwise incorporates the allegations contained above.

103.        This Count is based upon Section I of the Sherman Antitrust Act, 15 U.S.C. §1.

104.        ADP and FMR made contracts creating an openly publicized joint venture as a combination to monopolize the market for employer outsourced payroll contribution Simple IRA mutual fund accounts.

105.        In the alternative, ADP and FMR conspired to monopolize the market for employer outsourced payroll contribution Simple IRA mutual fund accounts, concealing the kickbacks paid by FMR and accepted by ADP to exclude competing mutual fund companies from access to the employer outsourced payroll contribution Simple IRA mutual fund market.

106.        ADP has substantial market power over the offering of outsourced payroll deduction financial services products including mutual funds and has the power to set prices for opening and maintaining a Simple IRA mutual fund account and the power to exclude mutual fund companies from outsourced payroll deduction delivery of Simple IRA mutual fund accounts for a substantial part of US commerce.

20

107.     FIDELITY has substantial market power over mutual funds, having the ability to set prices and pay large kickbacks or commercial bribes to exclude competitors from distribution channels, including outsourced payroll deductions for Simple IRA mutual funds.

108.     ADP and FMR made contracts excluding competitors during the class period, creating control over 70% of the outsourced payroll deduction, Simple IRA mutual fund market and 100% of the ADP outsourced payroll deduction, Simple IRA mutual fund market.

109.     The plaintiff and the Class are employers and employees injured by the inability to offer competing mutual funds to their employees through their outsourced payrolls managed by ADP and as employees having access to only the inferior FIDELITY ADVISOR mutual funds that cost too much as a result of undisclosed kickbacks and commercial bribes paid by FIDELITY to ADP. The plaintiff and the Class as employers and employees are a substantial part of the U.S. market for Simple IRA mutual funds through outsourced payroll deduction and are injured economically in a way that caused substantial financial losses to themselves as consumers and their dependents and beneficiaries. The plaintiff and the Class would not have been injured, but for the defendants ADP and FMR's agreement to restrain trade.

### SEVENTH CLAIM

**For Violations of Section 1 of The Sherman Antitrust Act for Product Tying against Automatic Data Processing, Inc. and Fidelity Management & Research Company, ("FMR") [15 U.S.C. §1]**

110.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging securities violations and otherwise incorporates the allegations contained above.

111.     This Count is based upon Section I of the Sherman Antitrust Act, 15 U.S.C. §1.

112.     ADP and FMR made agreements tying the purchase of ADP Simple IRAs investment accounts to FIDELITY ADVISOR mutual fund accounts.

113.     ADP has substantial market power over the offering of outsourced payroll deduction financial services products including mutual funds and has the power to set prices for opening and maintaining a Simple IRA mutual fund account and the power to exclude mutual fund companies from outsourced payroll deduction delivery of Simple IRA mutual fund accounts for a substantial part of US commerce.

114.     FIDELITY has substantial market power over mutual funds, having the ability to set prices and pay large kickbacks or commercial bribes to exclude competitors from distribution channels, including outsourced payroll deductions for Simple IRA mutual funds.

21

115.        ADP and FMR made an agreement to tie the Simple IRA investment accounts offered by ADP to FIDELITY ADVISOR mutual funds offered by FIDELITY. Substantial market demand exists for Simple IRAs among eligible employers and employees in firms of one hundred employees or less. Similarly, substantial market demand exists for mutual funds among eligible employers and employees in firms of one hundred employees or less. The demand for both products is independent of each other, given that Simple IRA's are available in non mutual fund accounts as common savings or in certificates of deposits money market fund accounts. ADP and FIDELITY'S tying of Simple IRA accounts to FIDELITY ADVISOR mutual funds created control over 70% of the outsourced payroll deduction, Simple IRA mutual fund market and 100% of the ADP outsourced payroll deduction, Simple IRA mutual fund market.

116.        The plaintiff and the Class are employers and employees injured by the inability to offer competing mutual funds or non-mutual fund company retirement savings products to their employees through their outsourced payrolls managed by ADP and as employees having access to only the inferior FIDELITY ADVISOR mutual funds tied to ADP's Simple IRA, during the Class period. The plaintiff and the Class as employers and employees are a substantial part of the U.S. market for Simple IRAs through outsourced payroll deduction and are injured economically in a way that caused substantial financial losses to themselves as consumers and their dependents and beneficiaries. The plaintiff and the Class would not have been injured, but for the defendants ADP and FMR's agreement to restrain trade through tying the Simple IRA to FIDELITY mutual funds.

### VIOLATIONS OF THE CLAYTON ANTITRUST ACT
### EIGHTH CLAIM

**For Violations of Section 2(c) of the Robinson-Patman Act for Product Tying against Automatic, Data Processing Inc. (ADP) and Fidelity Management & Research Company, ("FMR") Fidelity Distributors Company (FIDELITY) Arthur F. Weinbach, Russell P. Fradin, Edward C. Johnson 3rd And Deloitte & Touche LLP [15 U.S.C. §13 (c)]**

117.        Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging securities violations and otherwise incorporates the allegations contained above.

118.        This Count is based upon Section I of the Sherman Antitrust Act, 15 U.S.C. §13 (c).

119.        FMR paid ADP 3.5% of each FIDELITY ADVISOR account set up through ADP's Simple IRA payroll deductions. An additional .5% of each account was paid by FMR to ADP monthly for the duration of the account. ADP and FMP concealed these fees, not disclosing them to the Simple IRA and FIDELITY ADVISOR mutual fund account holders and listing them in internal ADP and FIDELITY documents as administration fees, even though all of ADP and FIDELITY's disclosures stated neither ADP, ADP Broker-Dealer, Inc or JAMES P. BLAKE were providing investment advisory services and in fact were not doing so and ineligible for service based

22

payments in connection with the marketing of FIDELITY ADVISOR mutual funds.

120.        ADP's CEO ARTHUR F. WEINBACH, and the group president of ADP's employer services division, RUSSELL P. FRADIN, made the agreement with FIDELITY ADVISOR mutual funds to accept these substantial commercial bribes in exchange for providing FIDELITY an exclusive market to ADP's Simple IRA clients. FIDELITY"S chairman and chief executive EDWARD C. JOHNSON 3rd approved these substantial payments as he ratified other payment schemes to buy "shelf space" from distributors other than ADP. ADP's independent auditing firm, DELOITTE & TOUCHE LLP, concealed or helped to conceal the commercial bribes paid by FMR to ADP by accounting for the payments as administrative fees when all documentation indicated no services were rendered for this substantial stream of income which would have been excessive even if ADP BROKER-DEALER, INC. had actively managed the investment of Simple IRA client funds, providing investment advice, which it disclaimed.

121.        DELOITTE & TOUCHE LLP further assisted in concealing the commercial bribes by not certifying quarterly an annual report including income derived from the false payments and where it was undisclosed by ADP's CEO ARTHUR F. WEINBACH as it was required under The Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, § 302.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

        (a) Determining that this action is a proper class action and appointing plaintiff as Lead Plaintiff and her counsel as Lead Counsel for the Class and certifying them as Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

        (b) Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount in excess of $75,000.00 to be proven at trial, including interest thereon;

        (c) Awarding plaintiffs and the Class, to the extent they still hold shares of the Fidelity Mutual Funds, rescissory damages in accordance with Section 12(a)(2) of the Securities Act or, if sold, compensatory damages;

        (d) Awarding plaintiffs and the Class rescission of their contract with ADP and recovery of all fees paid to ADP pursuant to such agreement;

        (e) Awarding plaintiffs and the Class treble damages for antitrust violations of the defendants.

        (f) Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(g) Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

S/Bret D. Landrith

_____
Bret D. Landrith # KS00500
Kansas Supreme Court ID # 20380
Apt. # G33,
2961 SW Central Park, Topeka, KS  66611
1-785-267-4084
landrithlaw@cox.net
Attorney for Plaintiff
Donna Huffman

## DEMAND FOR TRIAL BY JURY

Comes now plaintiff and makes demand for a trial before 12 jurors.

S/Bret D. Landrith
_____
Bret D. Landrith

## DESIGNATION OF PLACE OF TRIAL

Comes now plaintiff and designates Kansas City, Missouri as the place of trial.

S/Bret D. Landrith
_____
Bret D. Landrith

24

STATE OF KANSAS )
                   )    **SS:**
COUNTY OF JEFFERSON )

I, Donna Huffman being of lawful age and being first duly sworn upon my oath, state that I am the plaintiff herein and that I have read the above and foregoing Complaint and find the statements therein made to be true and correct to the best of my information, knowledge and belief. I have reviewed the complaint and authorize its filing;

I did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this title;

I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

I, Donna Huffman hereby set forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint- I purchased an ADP Simple IRA account in the Fidelity GNMA mutual fund but was instead substituted Fidelity Advisor Mortgage Securities CI T. On 6/30/03 I had 735.507 shares;

I have not participated in any other action under this title, during the 3-year period preceding the date on which this certification is signed, in which I sought to serve, or served, as a representative party on behalf of a class; and

I will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4) of section 27 of the Securities Act of 1933; stating; "The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class."

_____
Donna Huffman, Plaintiff

Subscribed and sworn to before me this 14th day of ___Nov___, 2005.

_____
Notary

NOTARY PUBLIC – State of Kansas
ALESSA D. CHAIRMAN
My Appt. Expires 4-28-08